**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KAREN BURDEN on behalf of AA,**

                              **Plaintiff,**

              **v.**                                          **5:05-CV-846**
                                                              **(FJS/GJD)**

**COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**
_____

**APPEARANCES**                          **OF COUNSEL**

**OLINSKY & SHURTLIFF, LLP**             **JAYA A. SHURTLIFF, ESQ.**
300 South State Street, 5th Floor
Syracuse, New York 13202
Attorneys for Plaintiff

**OFFICE OF THE UNITED**                 **WILLIAM H. PEASE, AUSA**
**STATES ATTORNEY**
100 South Clinton Street
P.O. Box 7198
Syracuse, New York 13261-7198
Attorneys for Defendant

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

        Plaintiff filed an application for supplemental security income ("SSI"), on behalf of her

daughter AA, on July 11, 2000.  *See* Administrative Transcript ("Tr.") at 84.  The application

alleged disability on the basis of mild mental retardation, learning disorder, and speech and social

functioning impairments.  *See id.*  Plaintiff's application was initially denied and, after a hearing,

an Administrative Law Judge ("ALJ") also denied the application.  Plaintiff requested that the

Appeals Council review the ALJ's decision; the Appeals Council did so and remanded the claim so that the ALJ could further compare the severity of AA's impairments to the requirements of the listed impairments at Appendix 1, Subpart P, Regulation No. 4, specifically Section 112.05, and could obtain evidence from a medical expert to clarify the nature and severity of AA's impairments and to assist in determining whether those impairments met or equaled a listed impairment. *See id.* at 66-67.

ALJ Joseph Medicis held a hearing on remand on August 20, 2003. *See id.* at 270-97. Subsequently, he held a supplemental hearing on October 21, 2003. *See id.* at 298-343. On December 5, 2003, the ALJ issued a decision finding AA not disabled. The Appeals Council denied Plaintiff's request for review on June 2, 2005, at which time the ALJ's decision became the Commissioner's final decision. *See id.*

On July 7, 2005, Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) to review that final decision. *See* Dkt. No. 1. In support of her argument that the Court should reverse Defendant's decision and award benefits, Plaintiff asserted (1) that the ALJ erred when he found AA's IQ scores invalid, contrary to Listing 112.00(D)(10), and AA's impairments consequently were of a severity necessary to meet or equal the requirements of Listing 112.05, and (2) that the ALJ's credibility evaluation was improper. *See* Plaintiff's *Brief* at 10-16. In response, Defendant contended that there was substantial evidence in the record to support the ALJ's decision and that, therefore, the Court should dismiss Plaintiff's complaint.

## II. BACKGROUND

**A.      Personal history**

Plaintiff brings this action on behalf of her daughter AA, who was seven years old at the time of the administrative hearing on August 20, 2003, and eight years old at the time of the supplemental hearing on October 21, 2003.  *See* Tr. at 84, 270-343.  Plaintiff alleges disability on the part of AA due to mild mental retardation, learning disorder, and speech and social functioning impairments.  *See id.* at 84; Plaintiff's Brief at 1.

**B.      Medical and educational evidence**

AA's pediatrician noted that, as early as ages one and two, AA had developmental delays and referred her to early intervention for evaluation.  *See* Tr. at 216.  Early developmental milestones were delayed; AA walked at age two, talked at age three and was toilet trained at age four.  *See id.* at 124.  On June 27, 2000, AA scored well below her chronological age of four years, ten months, in all developmental areas, including scores of three years, six months in cubes, copying forms, writing name, naming animals, and overt behaviors.  *See id.* at 124.  Her overall mental age was measured at three years, six months.  *See id.*  Although her overall speech/language score was considered passing, her vocabulary was weak.  *See id.* at 125.  Robert Magee, a school psychologist, considered AA's scores to be of "significant concern" and recommended more comprehensive psycho-educational assessments.  *See id.*

A psycho-educational assessment was conducted on July 17, 2000, and yielded similarly low test scores.  *See id.* at 126.  AA scored in the ninth percentile for verbal ability, the sixth percentile for nonverbal ability, and the fifth percentile for general conceptual ability.  *See id.*

Dr. Magee noted that the low percentile in general conceptual ability was misleading because AA had demonstrated a "wide range [of] strengths and weaknesses in both verbal and non-verbal skills," indicating that her level of potential was higher than the scores would indicate. *See id.* at 127. Dr. Magee opined that AA had significant deficits in the areas of vocabulary and language, expressive vocabulary skills in particular, in some areas of non-verbal reasoning, and in visual-motor integration. *See id.* at 129, 131. He recommended that AA be classified as a speech-impaired student and that she be placed in special education. *See id.* at 129.

AA was placed in special education classes and repeated kindergarten when she was transferred to a new school district for the 2001-2002 school year. *See id.* at 170, 286. Her kindergarten teacher at Hannibal Central Schools stated that, as of AA's second year in kindergarten, she was at grade level in academic areas but had difficulty with listening skills and work habits. *See id.* at 170. AA showed difficulty listening to stories and directions and had a generally short attention span. *See id.* In addition, her fine motor skills were not consistently at grade level, and she was unable to tie her own shoes, handled scissors poorly, and had difficulty tracing a line. *See id.* However, she reportedly made friends easily. *See id.*

An Individual Education Plan ("IEP"), developed at a June 5, 2002 meeting of the Committee on Special Education, found that AA was at the sixth month of kindergarten level in reading and writing and at the tenth month of kindergarten level in mathematical skills. *See id.* at 182. Despite these below average levels, measured after two years of kindergarten, it was determined that AA no longer needed special education services or speech therapy, although her attention and impulsivity were flagged for monitoring. *See id.* at 189. During the 2002-2003 school year, AA's first grade teacher reported that AA worked at grade level. *See id.* at 173-74.

AA's mother "completely disagree[d]" with this assessment.  *See id.* at 181.

On August 2, 2000, Dr. Kristen Barry, Ph.D., evaluated AA.  *See id.* at 232.  Dr. Barry assessed AA with a verbal Intelligence Quotient ("IQ") score of 75, performance IQ of 55, and full scale IQ of 61, which placed AA's cognitive functioning within the deficient range.  *See id.* at 134.  AA's verbal scores were in the borderline range, and her nonverbal skills were in the deficient range.  *See id.* at 234.  Dr. Barry opined that AA's expressive vocabulary and practical judgment were below average, her visual motor skills were significantly below average to deficient, her ability to scan pictures without missing visual details was significantly below average, and her personal relationships were fair to poor.  *See id.* at 234.  Dr. Barry also noted AA's poor attention span, *see id.* at 235, and her difficulty understanding and following age-appropriate directions,  *see id.*  Dr. Barry recommended early intervention services and special education services and gave a guarded prognosis due to significant cognitive delays.  *See id.*  Dr. Barry diagnosed learning disorder, not otherwise specified ("NOS") and mild mental retardation. *See id.*

Dr. Carlos Gieseken evaluated the evidence in this case but did not personally examine AA.  *See id.* at 237.  He concluded that AA's impairments were severe but that they did not meet or equal a listing or cause any marked limitations in functioning.  *See id.* at 237-39.

Dr. Barry again examined AA on May 9, 2003, and submitted a psychiatric and intelligence evaluation.  *See id.* at 241-47.  Upon mental status examination, AA demonstrated expressive language skills below age expectations, with fair receptive language skills; coherent and goal-directed thought processes; grossly intact attention and concentration; fairly intact recent and remote memory; fair insight and judgment; and deficient intellectual functioning with

a limited general fund of information.  *See id.* at 242-43.  AA was able to groom and dress herself at an age-appropriate level.  *See id.* at 243.  Dr. Barry opined that, as of that date, AA was able to attend to tasks and follow and understand simple instructions but had difficulty completing age-appropriate tasks.  *See id.*  She noted that AA was "quite limited" in intellectual functioning, with a poor frustration tolerance.  *See id.*  Dr. Barry recommended that the school system evaluate AA for alternative educational placement due to her learning delays and possible speech delays.  *See id.*  Dr. Barry gave a guarded prognosis and a diagnosis of learning disorder, NOS, ruling out communication disorder; mild mental retardation; and vision problems.  *See id.* Upon intellectual examination, AA achieved a verbal IQ score of 71, a performance IQ of 68, and a full scale IQ of 67.  *See id.* at 247.  Her general cognitive functioning thus fell in the deficient range.  *See id.*

Ms. Kelly Carlton, a friend of the family, and AA's grandmother, Ms. Dorothy Decker, submitted reports in October 2003.  *See id.* at 195-96.  Ms. Carlton indicated that she had known AA her entire life (eight years) and stated that AA could not tie her shoes, perform multi-step tasks, read, or count very high.  *See id.* at 195.  Ms. Decker indicated that AA had difficulty reading, focusing when someone spoke to her, and retaining information, and had problems doing homework.  *See id.* at 196.


**C.      Hearing testimony**

At the hearing, AA testified that she did not know her own phone number or address, did not know the name of the school she attended, and did not have any friends.  *See id.* at 275.  AA's mother testified that AA, at eight years of age, could not read or write legibly.  *See id.* at 284.

A medical expert, Dr. Strickland, testified at the supplemental hearing that AA's IQ score of 55, attained when she was four years, eleven months old, probably did not accurately reflect AA's performance abilities and that, therefore, she would not meet Listing 112.05(C). *See id.* at 326. Dr. Strickland later stated that, in determining whether AA met Listing 112.05(C), "the evidence just tilts back and forth and does not allow a clear and unambiguous rendering of the record." *See id.* at 337. He testified that AA had mild to moderate limitations in social functioning and that her low IQ scores that Dr. Barry obtained in 2003 were valid measures. *See id.* at 328, 337. Finally, he stated that it was unclear whether AA had a "marked" difficulty so as to satisfy a listed impairment.

## III. DISCUSSION

### A.      Standard for childhood disability

An individual under the age of eighteen is disabled and, thus, eligible for SSI benefits if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). That definitional provision goes on to exclude from coverage any "individual under the age of 18 who engages in substantial gainful activity . . . ." 42 U.S.C. § 1382(a)(3)(C)(ii).

By regulation, the agency has prescribed a three-step evaluative process for the Commissioner to employ in determining whether a child can meet the statutory definition of disability. *See* 20 C.F.R. § 416.924; *Kittles on behalf of Lawton v. Barnhart*, 245 F. Supp. 2d

-7-

479, 487-88 (E.D.N.Y. 2003).  The first step, which bears some similarity to the first step of the familiar five-step analysis used in adult-disability cases, requires a determination of whether the child has engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488.  If so, then both statutorily and under the regulations the child is ineligible for SSI benefits.  *See* 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the claimant has not engaged in substantial gainful activity, the second step of the prescribed test requires examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are properly regarded as severe, in that they cause more than a minimal functional limitation.  *See* 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488.  If the existence of a severe impairment is discerned, the agency must then determine, at step three, whether that impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth under 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Listings").  *See* 20 C.F.R. § 416.924(d).  Equivalence to a listing can be either medical or functional.  *See id.*; *Kittles*, 245 F. Supp. 2d at 488.  If an impairment meets, or qualifies as medically or functionally equivalent to, a listed disability and the twelve-month durational requirement is satisfied, the Commissioner will find that the claimant is disabled.  *See* 20 C.F.R. § 416.924(d)(1).

Analysis of functionality is informed by consideration of how a claimant functions in six main areas denominated as "domains."  *See* 20 C.F.R. § 416.926a(b)(1).  The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do."  *Id.*  Those prescribed domains include the following:

(i) [a]cquiring and using information;

-8-

(ii) [a]ttending and completing tasks;

(iii) [i]nteracting and relating with others;

(iv) [m]oving about and manipulating objects;

(v) [c]aring for [oneself]; and

(vi) [h]ealth and physical well-being.

20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established in the event of a finding of an "extreme" limitation, meaning "more than marked," in a single domain.  20 C.F.R. § 416.926a(a).  An "extreme limitation" is an impairment which "interferes *very seriously* with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

Alternatively, a finding of disability is warranted if a "marked" limitation is found *in any two* of the listed domains.  *See* 20 C.F.R. § 416.926a(a).  A "marked limitation" exists when the impairment "interferes *seriously* with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i) (emphasis added).  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

**B.      Scope of review**

In reviewing the Commissioner's final decision, a court must determine whether the

Commissioner applied the correct legal standards and whether there is substantial evidence in the record as a whole to support the decision.  *See Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)) (other citations omitted).  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports his decision.  *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citation omitted).  A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991) (citations omitted).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quotation omitted).  "It is more than a mere scintilla or a touch of proof here and there in the record."  *Id.*

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Id.* (citations omitted).  "However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision."  *Lewis v. Comm'r of Soc. Sec.*, No. 6:00 CV 1225, 2005 WL 1899399, *1 (N.D.N.Y. Aug. 2, 2005) (citations omitted).

In the present case, the ALJ found that (1) AA has never engaged in substantial gainful activity; (2) AA has borderline intellectual functioning, which is a severe impairment; (3) AA's

mother's testimony was partially credible; (4) the limitations resulting from the effects of AA's

impairment do not meet, medically equal, or functionally equal the criteria of any of the listed

impairments in Appendix 1, Subpart P, Regulation No. 4; and (5) AA does not have a medically

determinable physical or mental impairment that results in two marked functional limitations or

one severe functional limitation.  *See* Tr. at 24-25.  Based upon these conclusions, the ALJ

directed a finding of nondisability.  *See id.* at 25.

As noted, Plaintiff takes issue with a number of the ALJ's findings and his ultimate

conclusion of nondisability.  The Court will address each of Plaintiff's arguments in turn.

### 1. AA's IQ Scores and the Listings

Plaintiff argues that the ALJ failed to evaluate AA's IQ test scores properly and failed to

assess properly whether AA's impairments met or equaled Listing 112.05.  *See* Plaintiff's Brief at

12-15.  AA took two IQ tests, one when she was four years old and one when she was seven

years old.  As of the date of the ALJ's decision, the first IQ scores were invalid because more

than one year had elapsed since the time of testing.[1]  However, the IQ test scores that Dr. Barry

obtained in May of 2003 were current and valid as of the date of the ALJ's decision.[2]  *See* Tr. at

247.

_____

[1] IQ scores obtained before age seven are current for one year if the IQ score is 40 or
above.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10).  Under this rule, the
August 2000 scores were valid only until August 2001, and were no longer valid at the time that
the ALJ rendered his decision in December 2003.

[2] IQ scores obtained between ages seven and sixteen are valid for two years from the date
of testing when the IQ score is 40 or above.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1,
§ 112.00(D)(10).

The ALJ considered both IQ scores but failed to proceed to a proper analysis of whether the May 2003 IQ scores would combine with other impairments to result in AA meeting or equaling a listed impairment. *See id.* at 22-23.  Instead, he stated that the "discrepancy" between the August 2000 and May 2003 scores indicated that "neither . . . can be accepted as indicative of academic success" and prematurely proceeded to a discussion of functional equivalency. *See id.* The ALJ's analysis of AA's IQ test scores failed to take into account their validity under the regulations and ignored the May 2003 scores' implications for whether AA met or equaled a listed impairment.

In May 2003, AA scored a verbal IQ of 71, a performance IQ of 68, and a full scale IQ of 67, which put her performance and full scale IQ scores within the range encompassed by two listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 112.05.  Section 112.05(D) provides that a child between the ages of three and eighteen will be considered disabled when the child has "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function[.]"  20 C.F.R. Part 404, Subpart P, Appendix 1, Section 112.05(D).  Section 112.05(E) provides that a child between the ages of three and eighteen will be considered disabled when the child has a valid verbal, performance, or full scale IQ of 60 through 70 resulting in at least one of the following limitations described in Section 112.02(B)(2)(b), (B)(2)(c), or (B)(2)(d):

> (1) [Section 112.02(B)(2)(b)] Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

(2) [Section 112.02(B)(2)(c)] Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

(3) [Section 112.02(B)(2)(d)] Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 112.02(B)(2)(b), (B)(2)(c), (B)(2)(d).

On this record, there is evidence that AA's impairments may meet Listing 112.05(D) or 112.05(E). AA was repeatedly diagnosed as having a learning disability, which may well impose an "additional and significant limitation of function" as contemplated by Section 112.05(D). *See* Tr. at 235, 243. Additionally, there is evidence in the record that AA had extensive problems with attention and concentration, which would support a finding of disability under Section 112.05(E) (marked limitations in concentration, persistence, or pace).[3] *See id.* at 170, 195-96, 235.

----

[3] Section 112.00(C)(3) of 20 C.F.R. Part 404, Subpart P, Appendix 1, provides that for primary school children ages six through twelve,

the intent of the functional criterion described in paragraph B2d, i.e., deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, is to identify the child who cannot adequately function in primary school because of a mental impairment. Although grades and the need for special education placement are relevant factors which must be considered in reaching a decision under paragraph B2d, they are not conclusive. There is too much variability from school district to school district in the expected level of grading and in the criteria for special education placement to justify reliance solely on these factors.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 112.00(C)(3).

Without the benefit of a proper analysis of whether AA's impairments met or equaled a listed impairment under Section 112.05, the Court is unable adequately to determine whether substantial evidence supported the ALJ's decision that a listing was not met.  Thus, the Court remands this case for further consideration of whether AA's impairments met or equaled the requirements of a listed impairment.  On remand, the Court directs the ALJ to consider AA's valid May 2003 IQ scores properly and to collect such additional evidence as necessary to determine whether AA met the additional requirements of Sections 112.05(D) or (E).

### 2. Credibility

Plaintiff argues that the ALJ improperly assessed the credibility of her hearing testimony as well as AA's hearing testimony.  *See* Plaintiff's Brief at 15-16.  An ALJ who rejects subjective testimony "'must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence.'"  *Melchior v. Apfel*, 15 F. Supp. 2d 215, 219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)) (other citation omitted).  It is insufficient for an ALJ to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  SSR 96-7p, 1996 WL 374186, *4 (SSA July 2, 1996).  Absent such findings, a remand is required.  *See Miller v. Shalala*, 894 F. Supp. 73, 75 (N.D.N.Y. 1995); *Knapp v. Apfel*, 11 F. Supp. 2d 235, 238 (N.D.N.Y. 1998) ("a finding that the Commissioner has failed to specify the basis for his conclusions is [a] . . . compelling cause for remand").  The regulations provide that an analysis of third parties' statements and testimony regarding the claimant's impairments will be taken into

-14-

account as provided above pursuant to 20 C.F.R. Section 416.929.  *See* 20 C.F.R.

§ 416.929(C)(3).

The Court agrees with Plaintiff that, in this case, the ALJ did not follow the proper

credibility analysis.  In support of his decision that neither AA nor her mother were fully

credible, the ALJ stated that,

> [h]aving considered the medical evidence and the claimant's
> testimony, the undersigned concludes that the claimant's
> allegations as to the limiting effects of her impairments are not
> entirely credible, at least not to the extent that she would be unable
> to perform age-appropriate activities. . . . [T]he claimant's mother
> claims that the claimant has social, emotional and adaptive
> problems. . . . There is no indication in the record that the claimant
> has inappropriate social interaction with others or that she is unable
> to adapt to changes in the classroom.  The claimant's mother is
> commended for her concerns about the clamant's welfare and her
> attempts to obtain assistance from the Hannibal Central School
> district for her child.  The undersigned notes that, while there may
> be other school districts which would show more concern as the
> claimant's mother testified, the evidence of record does not support
> the mother's contentions.  The child is otherwise healthy and well
> behaved.

*See* Tr. at 24.

This analysis fails to assess any of the factors set out in 20 C.F.R. § 416.929 and fails to

explain why the record does not support Plaintiff's or AA's allegations as the ALJ asserts.  As

such, the ALJ has failed to give adequate reasoning that will allow the Court to assess whether

there is substantial evidence in the record to support his credibility determination.  *See Melchior*,

15 F. Supp. 2d at 220.  Thus, the Court directs the ALJ on remand to reassess Plaintiff's and AA's

credibility.

-15-

## IV. CONCLUSION

After carefully reviewing the entire record in this case, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that the Commissioner's decision denying disability benefits is **REVERSED** and this matter is **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[4] for further consideration in accordance with this decision; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties.

**IT IS SO ORDERED.**

Dated: July 14, 2008
        Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge

---

[4] Sentence 4 provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing."  42 U.S.C. § 405(g).